### 67348. SIGMAN v. GOVE et al.

QUILLIAN, Presiding Judge.

Plaintiff-appellant Sigman appeals the grant of summary judgment to defendant-appellees Gove, Milhous and The Walton Tribune (Tribune) in an action alleging libel.

Sigman, a real estate broker and a former state representative, was a candidate for the state senate in the 45th District, which encompassed Newton, Rockdale and Walton Counties. After the primary Sigman was participating in a runoff election campaign against Dawkins, with the election to be held on August 31, 1982. Gove was the editor and Milhous the general manager of the Tribune, a newspaper which was published on Tuesdays and Thursdays, with editorials on Tuesdays only. Gove had information that Sigman had been involved in a public drunkenness and concealed weapon incident in DeKalb County in 1975. On the afternoon of August 24, Gove personally informed Sigman of this and of his intent to publish the story. Sigman said the incident was unfounded and asked Gove not to publish it. Gove told Sigman he would present Sigman's side of the matter if Sigman supplied him the substantiating documents Sigman claimed he had by the following morning. That evening Sigman's opponent, Dawkins, received 15 to 20 telephone calls from unidentified persons, some of whom said they were Sigman's supporters, who excoriated Dawkins for causing Sigman's DeKalb County incident to be published in the Tribune. Four of the callers made threats against Dawkins or his family. The calls were so abusive that Dawkins resorted to leaving his telephone off the hook. Although Dawkins knew of the incident involving Sigman, until he started receiving the telephone calls he was unaware that the Tribune knew of it or that it was going to be published. Late that evening, for several reasons, including fear for his family's safety, Dawkins called a reporter, Shellnut, to get the story stopped and was referred to Gove. After hearing what Dawkins had to say, Gove told him the story would not be published, and it was not. On August 31, the day of the election, the Tribune published an editorial endorsing Sigman's opponent, Dawkins, written by Gove and approved by Milhous,

which stated in part: "The Tribune had information that may have been detrimental to the campaign of . . . Sigman. After weeks of deliberation, we decided to run the story. Sigman was invited to give his side of the story. He did. He asked us not to run the story. He said he had affidavits proving the seven-year-old incident was trumped up and had no reflection on his character. He was asked to return with said information the next morning. He was advised, however, that the story probably would still run, with his version receiving equal treatment. That night, the person Sigman and his supporters thought responsible for leaking the story was bombarded with threatening phone calls. We were asked by that person to withhold the story from the paper. He said he feared for the safety of his family. The story did not run. Both . . . Sigman and . . . Dawkins appear, on paper, to be qualified to represent Newton, Rockdale and Walton Counties in the state senate. But in terms of character, we have to go with Dawkins. If Sigman's supporters will resort to such tactics now, what can we expect of them if he should become our state Senator? We don't care to find out . . . Let's keep Georgia moving forward. We don't need a return to the old rough-and-tumble, 'do it my way or else,' brand of politics."

Sigman lost the election with Dawkins taking 60 percent of the vote. He then commenced this action alleging that the editorial was false, maliciously published, and defamed him by implying that he had made terroristic threats and threatened the life of his opponent causing him to lose the election and damaging his occupation. The complaint was later amended to allege republication of the defamation when the Tribune published a story in January 1983 concerning the lawsuit. Appellees answered admitting the publication but denying liability on the grounds that Sigman was a public figure, the alleged libelous statements were true, and that the statements were made with the belief that they were true and without malice. *Held:*

A civil action for libel by a public figure against a newspaper requires clear and convincing proof that a defamatory falsehood alleged as libel was published with actual malice; that is, with knowledge that it was false or with reckless disregard of whether it was false or not. New York Times v. Sullivan, 376 U. S. 254 (84 SC 710, 11 LE2d 686); Curtis Publishing Co. v. Butts, 388 U. S. 130 (87 SC 1975, 18 LE2d 1094); *Hemenway v. Blanchard,* 163 Ga. App. 668 (1) (294 SE2d 603).

Sigman, as a candidate for public office, was a public figure. Monitor Patriot Co. v. Roy, 401 U. S. 265 (1) (91 SC 621, 28 LE2d 35); Ocala Star-Banner Co. v. Damron, 401 U. S. 295, 299 (91 SC 628, 28

LE2d 57). Compare, *Hemenway v. Blanchard,* 163 Ga. App. 668 (1), supra.

That being so, alleged defamatory comment or criticism relating to his qualification as a candidate is actionable only if made with actual malice. " 'Malice' in the New York Times' context is not the intentional doing of a wrongful act without cause or excuse, and with intent to inflict injury but instead, what is required is 'clear and convincing proof that a defamatory falsehood alleged as libel was uttered with "knowledge that it was false or with reckless disregard of whether it was false or not." ' Rosenbloom v. Metromedia, 403 U. S. 29, 30 [91 SC 1811, 29 LE2d 296], supra. 'Factual error, content defamatory of official reputation, or both, are insufficient to warrant an award of damages for false statements unless "actual malice" — knowledge that the statements are false or in reckless disregard of the truth — is alleged and proved.' New York Times v. Sullivan, 376 U. S. 254 (c), supra. 'In order that it can be found that a defendant, within the meaning of *New York Times,* acted in "reckless disregard" of whether a defamatory statement which he made about a public [figure] is false or not, there must be sufficient evidence to permit the conclusion that the defendant had serious doubts as to the truth of his publication.' St. Amant v. Thompson, 390 U. S. 727 (88 SC 1323, 20 LE2d 262). The Supreme Court, in Gertz and St. Amant, supra, emphasized a necessity 'for a showing that a false publication was made with a "high degree of awareness of . . . probable falsity" ' 390 U. S. at 731 and 418 U. S. at 332." *Hemenway v. Blanchard,* 163 Ga. App. 668 (2), 671-72, supra.

Appellees' evidence was in the form of affidavits and depositions. Dawkins testified that he received phone calls from unidentified persons, some of whom claimed to be Sigman supporters, accusing him of slandering Sigman by giving false information to the Tribune. Some of the calls were physically threatening. He called Sigman and denied having given any information to the Tribune. He then called the reporter and finally Gove, told them of the phone calls, and asked that the story not be published. Gove told him that it would not be. The published statement that "the person Sigman and his supporters thought was responsible for leaking the story was bombarded by threatening phone calls" was a correct statement.

Gove testified that he had not received the information about Sigman from Dawkins. When he told Sigman that he intended to publish the 1975 incident, Sigman made several remarks indicating that he believed Dawkins was responsible for the proposed pub-lication. Gove acceded to Dawkins' request that the story not be

printed because of the threats to Dawkins. Sigman was the only person outside of the Tribune staff who knew of the proposed publication and the phone calls to Dawkins were made the evening after Sigman was made aware of it. Dawkins told him that some of the calls were made by persons who claimed to be Sigman supporters. From these circumstances he formed the opinion that the calls were made by Sigman's supporters, which he never doubted the truth of, and published the editorial.

Milhous testified that he approved the editorial and never doubted the truth of the matters in it.

Sigman testified that Dawkins was the only person who would have benefited by the story being published.

" '[A]ctual malice' under the New York Times case . . . 376 U. S. 254, was made 'a constitutional issue to be decided initially by the trial judge vis-a-vis motions for summary judgment and directed verdict . . . "applying the *Times* test of actual knowledge or reckless disregard of the truth. [Cit.] Unless the court finds, on the basis of pre-trial affidavits, depositions or other documentary evidence, that the plaintiff can prove actual malice in the *Times* sense, it should grant summary judgment for the defendant . . ." ' [Cit.]" *Williams v. Trust Co.,* 140 Ga. App. 49, 58 (230 SE2d 45). Accord, *Morton v. Stewart,* 153 Ga. App. 636, 642 (266 SE2d 230).

Sigman presented no competent evidence that the editorial statements were false. Nor did he present competent evidence contradicting appellees' evidence that they believed the statements were true. We find that "[n]othing [in the evidence] indicates an awareness by [appellees] of the probable falsity of . . . [the] statement about [appellant]. Failure to investigate does not in itself establish bad faith." St. Amant v. Thompson, 390 U. S. 727, 732-733 (88 SC 1323, 20 LE2d 262).

Appellees having presented evidence of a lack of actual malice and appellant having produced no competent evidence to the contrary, much less "clear and convincing proof" of actual malice, the trial court did not err in granting summary judgment to appellees. OCGA § 9-11-56 (c) (Code Ann. § 81A-156). Compare, *Savannah News-Press v. Whetsell,* 149 Ga. App. 233 (3) (254 SE2d 151).

*Judgment affirmed. Sognier and Pope, JJ., concur.*

DECIDED JANUARY 5, 1984 —
REHEARING DENIED JANUARY 31, 1984.

*John P. Howell,* for appellant.

*William L. Preston, R. James George, Jr.,* for appellees.